UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| JANE C. PURNELL FBO PURNELL FAMILY TRUST, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Case No. <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| NAVISTAR INTERNATIONAL CORPORATION, DANIEL C. USTIAN and ANDREW J. CEDEROTH, | ) ) ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | ) ) | |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## INTRODUCTION AND OVERVIEW

1.      This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the common stock of Navistar International Corporation ("Navistar" or the "Company") between November 3, 2010 and August 1, 2012, inclusive (the "Class Period"), who were damaged thereby (the "Class").

2.      Navistar is a holding company whose subsidiaries and affiliates produce commercial and military trucks, buses, diesel engines, recreational vehicles, and chassis, as well as provide parts and service for trucks and trailers. It operates in four segments: Truck, Engine, Parts, and Financial Services.

3.      During the Class Period, defendants issued materially false and misleading statements concerning the Company's financial condition and future business prospects. More specifically, defendants misrepresented and omitted material facts concerning Navistar's financial disclosures in filings with the U.S. Securities and Exchange Commission ("SEC"). Prior to the Class Period, the U.S. Environmental Protection Agency ("EPA") had imposed new regulations on 2010 model trucks that included strict emissions standards. The two primary engine technologies that emerged to meet the new standards were Exhaust Gas Recirculation ("EGR"), which reduced emissions by burning off exhaust pollutants within the engine (*i.e.* "in-cylinder"), and Selective Catalytic Reduction ("SCR"), which reduced emissions by treating the engine exhaust with a urea-based chemical after it left the engine. Navistar chose the EGR technology, not the SCR technology that its competitors were using to meet the new standards. Navistar then represented that the new EGR technology was compliant and the vehicles were ready for sale. By the beginning of the Class Period, it was clear that Navistar's decision to positively differentiate its emission control technology was unsuccessful.  Despite the $700

million Navistar had spent on developing its proprietary "Advanced EGR" engine, the Company had not even applied for certification of the EPA emissions standard (at 0.20g NOx) by the start of the Class Period - 10 months after the EPA standards had become effective. Instead, to keep selling trucks and to stay in business, Navistar initially used EPA credits it had previously earned and then started paying a non-compliance fine for each truck it sold. Thus, by the beginning of the Class Period, Navistar faced technological, legal and liquidity issues which threatened its business.

4.      To conceal this fact from Navistar's investors and customers, the Company's Chief Executive Officer ("CEO"), Daniel C. Ustian ("Ustian"), who had just months prior settled a separate SEC civil fraud action over Navistar's 2007 accounting restatement, repeatedly stated that Navistar had indeed achieved an engineering milestone and had an EPA-compliant EGR engine ready to be certified.  For example, between November 2010 and January 2011, Ustian falsely stated:

- "We're 100% there in terms of our ability to do it [achieve 0.20g NOx] ...."

- "[W]e'll be applying for our 0.2 certification here in the next couple of months."

- "Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams ...."

- "Since we were the only ones out there, there is a lot coming at us with this can't work and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over."

- "We will show you that product, by the way, in Melrose Park on the 25th. We will show you the modifications. It won't be a great drama to you because you won't be able to see anything other than - we would be able to show you the data that it meets 0.2 and show you how we are able to meet it."

5.      In fact, the EGR technology was not ready and Navistar would use EPA "credits" to initially comply and would ultimately have to adopt the same SCR technology of its competitors.

6.      As a result of defendants' false statements, the price of Navistar common stock traded at artificially inflated prices during the Class Period, reaching a high of $70.17 per share on April 26, 2011.

7.      In July 2012, Navistar admitted its failure to achieve an EPA-compliant EGR engine and announced that in order to remain in business it was adopting the same SCR technology used by its competitors.

8.      On August 2, 2012, Navistar issued a press release entitled "Navistar Announces Actions Designed to Enhance Competitive Position, Drive Profitable Growth and Increase Shareholder Value," announcing that is was withdrawing its full-year fiscal 2012 guidance until the release of its third fiscal quarter 2012 results in September (Navistar's fiscal year ends October 31st). The Company further disclosed that it received a formal letter of inquiry from the SEC involving an investigation of accounting and disclosure matters dating back to November 2010.

9.      As a result of this news, the price of Navistar's common stock dropped from a closing price of $24.77 per share on August 1, 2012 to $21.44 per share on August 2, 2012, a decline of approximately 13% in one trading day on volume of nearly 7.6 million shares. This decrease was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

10.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

4

(a)     Navistar's attempted methods for compliance with EPA guidelines had failed and Navistar would be forced to revise its plan to meet guidelines, incurring enormous costs to the Company.

(b)     Navistar did not timely have engines available to meet the 2010 EPA standards.

(c)     Navistar's filings with the SEC contained incomplete and misleading disclosures, including statements about the costs of recalls and details of various debts.

(d)     Based on the above, defendants lacked a reasonable basis for their positive statements about the Company and its revenue outlook.

11.    As a result of defendants' false statements, Navistar common stock traded at artificially inflated levels during the Class Period. When defendants revealed Navistar's true financial condition and future business prospects, the price of Navistar common stock fell over 69% from its Class Period high.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

14.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

15.     Navistar maintains its principal executive offices at 2701 Navistar Drive, Lisle, IL 60532. Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in this District.

16.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**THE PARTIES**

17.     Plaintiff Jane C. Purnell, for the benefit of the Purnell Family Trust, purchased Navistar common stock during the Class Period as set forth in the accompanying certification and was damaged thereby.

18.     Defendant Navistar is a holding company whose subsidiaries and affiliates produce commercial and military trucks, buses, diesel engines, recreational vehicles, and chassis, as well as provide parts and service for trucks and trailers. Navistar's common stock is traded under the symbol NAV on the New York Stock Exchange, which is an efficient market.

19.     Defendant Ustian was, at all relevant times, Chairman of the Board, President and CEO of the Company. During the Class Period, defendant Ustian sold 55,469 shares of his Navistar stock for proceeds of nearly $3.9 million. Ustian was replaced as CEO on August 27, 2012.

20.     Defendant Andrew J. Cederoth ("Cederoth") is, and at all relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of the Company. During the Class Period, defendant Cederoth sold 9,548 shares of his Navistar stock for proceeds of $642,962. This was on top of the $3.1 million in compensation Cederoth was paid for 2011.

21.     The defendants named in ¶¶19-20 are referred to herein as the "Individual Defendants."

22.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Navistar's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They had knowledge of and were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

23.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Navistar. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Navistar common stock was a success, as it: (i) deceived the investing public regarding Navistar's prospects and business; (ii) artificially inflated the price of Navistar common stock; (iii) caused plaintiff and other members of the Class to purchase Navistar common stock at inflated prices; and (iv) permitted the Individual Defendants to sell 65,017 shares of their Navistar stock at artificially inflated prices for proceeds of $4.5 million.

24.     The top officers and directors of Navistar also benefited, as the Company's purportedly favorable operating results contributed to the compensation paid to the officers during the Class Period, including defendant Ustian who received as much as $15.1 million for 2011.

## BACKGROUND

25.     Navistar is a holding company whose subsidiaries and affiliates produce International® brand commercial and military trucks, MaxxForce® brand diesel engines, IC BusTM brand school and commercial buses, Monaco® RV brands of recreational vehicles, and Workhorse® brand chassis for motor homes and step vans, and provide parts and service for all makes of trucks and trailers. In addition, it is a private-label designer and manufacturer of diesel engines for the pickup truck, van and SUV markets. It also provides retail, wholesale, and lease financing of trucks and parts. Navistar offers its products and services through dealers and distributors primarily in the United States, Canada, Mexico, Brazil, Argentina and India.

26.     Prior to the Class Period, Navistar and its competitors were focused on developing engine technologies to meet strict EPA emission standards that were applicable for 2010 model year trucks and engines. The two primary engine technologies that emerged were EGR, which reduced emissions by burning off exhaust pollutants within the engine (i.e. "in-cylinder"), and SCR, which reduced emissions by treating the engine exhaust with a urea-based chemical after it left the engine.

27.     While EGR was the method preferred by prospective customers due to convenience and cost factors, it quickly became apparent that SCR was the single viable option to reach the strict EPA emission standards (specifically the 0.20g NOx standard). In fact, every one of Navistar's competitors (*i.e*., Mack, Volvo, Daimler, PACCAR, etc.) had adopted SCR and

8

received EPA certification by the start of the Class Period. Navistar was the only holdout who claimed that it could develop an EGR engine that would be timely certified by the EPA. By the beginning of the Class Period, it was clear the strategy employed by Navistar was not working. Despite the $700 million Navistar had spent on developing its proprietary "Advanced EGR" engine, the Company had not applied for EPA certification at the 0.20g NOx standard by the start of the Class Period - 10 months after the EPA standards had become effective. Instead, to keep selling trucks and to stay in business, Navistar initially used EPA credits it had previously earned and then started paying a non-compliance fine for each truck it sold that failed the new standard. Thus, by the beginning of the Class Period, Navistar faced technological, legal and liquidity issues which threatened its business.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

28.     On November 3, 2010, Navistar announced it had shipped approximately 17,000 vehicles to U.S. and Canadian customers in the fiscal fourth quarter. The release stated in part:

> Navistar also advised that it has submitted certification to the EPA for its MaxxForce 15 and plans to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months, far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required.

29.     On November 3, 2010, Navistar held a held a press briefing at the Company's Engine Group facility in Huntsville, Alabama. CEO Ustian and other executives were later quoted in media articles.

30.     For example, on November 4, 2010 - Fleet Owner published an article entitled "Navistar says it has engines meeting 2010 emissions standard," which stated in part:

> When Navistar announced it was going to meet the Environmental Protection Agency's 2010 emissions mandate with Advanced EGR technology, many said it couldn't be done. Some said Navistar could only satisfy the EPA 2010 emissions

standard of 0.2 grams of nitrates of oxide (NOx) through the use of emissions credits that allowed its engines to emit 0.5 grams of NOx.

According to Dan Ustian, president & CEO, Navistar not only can meet the 0.2 NOx level without credits, but customers are warming to its distinct engine solution.

"We're 100% there in terms of our ability to do it," Dan Ustian, chairman & CEO of Navistar said at a press briefing on Wednesday at the company's Engine Group facility in Huntsville, AL. "It's really nothing to do with the technology anymore, it's [customer] experience. They don't have any experience with the engine."

Ramin Younessi, group vice president-product development & strategy, told Fleet Owner that engines meeting the 0.2 limit without credits will be submitted to EPA for certification "within the next few months."

31.     On November 4, 2010, Today's Trucking published an article entitled "Navistar:

NOx-compliant engine achieved," which stated in part:

Navistar International says it is on the verge of submitting for certification a MaxxForce 13 engine that finally meets the EPA's 0.2g NOx standard, but it will continue selling engines that exceed that EPA limit until its banked emissions credits run out.

Navistar - the sole heavy-duty engine maker to go with an advanced version of the 2007 EGR system rather than SCR technology - announced it will for the first time submit to EPA 0.2g NOx-compliant engines, `far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required."

During the tour, Dan Ustian, chairman & CEO said the new generation, 0.2g NOx-compliant models improve on fuel economy. They will be submitted to the EPA in the next few months... .

*        *        *

When asked for details before this posting, Navistar spokesman Roy Wiley would only confirm in an email that the "0.2g NOx MaxxForce 13 we mentioned in the release yesterday and plan to submit to the EPA for certification will achieve emissions `in-cylinder.' Stay tuned."

32.     On November 5, 2010, Truck News published an article entitled "Navistar nearly

ready to certify International MaxxForce at 0.2 g NOx," which stated in part:

Navistar International will soon certify its heavy-duty engines at 0.2 g/hp-hr NOx but it will not roll those engines out to industry for as long as possible, until it has exhausted its collection of emissions credits.

During a recent tour of the company's Huntsville, Alabama big bore engine plant, Navistar chairman, president and CEO Dan Ustian told media that the company will certify its engines at 0.2 g NOx so the industry has the peace of mind of knowing it is possible.

"Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams," he said, adding the company will then continue selling engines at today's 0.5 g NOx level "as long as we can," so customers will not have to endure another engine change so soon. The 0.2 g NOx engine won't be drastically different from today's, Ustian noted, but will require new algorithms and enhancements to fuel pressure and air management systems.

\*     \*     \*

"There is this (perception) that when you go to 0.2, you're going to lose fuel economy," Ustian said. "We'll be able to show you that it's better fuel economy (at 0.2 g) just because of improvements in the technology."

33.    On December 22, 2010, Navistar filed a Form 10-K with the SEC signed by defendants Ustian and Cederoth. The Form 10-K stated in relevant part:

**Our Strategy**

Our long term strategy is focused on three pillars:

I.    Great Products

- Growing our product line, including an expanded line of our Class 8 ProStar® and LoneStar® trucks and Class 4/5 TerraStarTM trucks manufactured under the International brand, the AC series of small shuttle buses manufactured under the IC brand, and the Vesta RV manufactured under the Monaco brand

- Maintain strong market share in our "traditional" classes, including School bus Class 6 and 7 medium, and Class 8 severe service

- Focusing on engine research and development in order to have a competitive advantage using Exhaust Gas Recirculation ("EGR") and other technologies for compliance with 2010 emissions standards

- Introducing our advanced engine technology in new markets

34.    The Form 10-K was accompanied by certifications signed by defendants Ustian and Cederoth, which stated in relevant part:

1.    I have reviewed this annual report on Form 10-K of Navistar International Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

35.    On December 22, 2010, after releasing its fourth fiscal quarter 2010 earnings results, Navistar hosted a conference call for analysts, media representatives and investors during which defendant Ustian represented the following:

[USTIAN:] Integration is a word that is tough to describe until you see it and we are going to be able to show you what integration means. But I want to point out one thing, and this is kind of our culture, we are the only ones that meets emissions in the cylinder.

We are the only ones that all of our vehicles will have our own engine in it. We are the only ones that have a full-integrated product there and we will show you why that is hard to copy. When you see it I think you will be impressed with how that will be difficult for others to match what we have got there.

[ANALYST:] Sorry about that my line got dropped. Just a couple of clarifications. Dan, can you talk about the fuel efficiency of your 13-liter 0.2 NOx versus an equivalent SCR 0.2 NOx engine? Do you anticipate running those comparisons?

[USTIAN:] Yes. You know, we will show you on the 25th, Ann, but basically it's this - it gets better. It gets better because there are advanced technologies in the same area that we worked on before. The fuel economy of the 0.2 will be better and there will be no change in heat rejection at the same time. So this product will be even better.

36.     On January 25, 2011, Navistar issued a press release announcing its earnings guidance for fiscal 2011. The Company projected substantial gains in fiscal 2011 earnings due in part to the Company's implementation of its "three-pillar growth strategy and improving economic conditions." The Company further reported it expected net income to be between $388 million and $466 million, or $5 to $6 diluted earnings per share ("EPS"), for the fiscal year ending October 31, 2011. The release stated in part:

> "As evidenced by our guidance, our strategy continues to drive value for our shareholders," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "Coming out of the recession, we have developed today's earning guidance around a stronger economy, further expansion of our after-market service parts business and continued benefit from great products, a competitive cost structure and profitable growth."

37.     On January 25, 2011, Navistar attended a Navistar International Analyst and Investor Day conference call for analysts, media representatives and investors during which defendant Ustian represented the following:

[USTIAN:] And what's the key ingredient? Differentiation and leadership. Now some people hear the word differentiation and they hear risk. And our competition actually is how they try to create an aura risk by, EGR for instance. They say well, EGR is brand new technology and there's risk to it, you can't get fuel economy, it's going to heat up; the whole nine yards that's been out there.

And then the other thing that they've done that's kind of interesting is they've used, after they realize that's in jeopardy here, they try other things, like how could all the companies be going one way and Navistar be going the other way? It must be Navistar is the problem. Well, they say, I've got European engineers. Everybody knows European engineers are smarter than the North American engineers. Well, the facts are now out, our products are out there and they're delivering actually a little bit better than what we said on fuel economy, durability, the whole thing.

*          *          *

[JACK ALLEN - President, North American Truck Group:] Few highlights. The MaxxForce 7 is doing phenomenal. We're seeing 9% better fuel economy than the prior model. The MaxxForce 13, as I've said the fuel economy is at parity or better than anything in the market and we'll be applying for our 0.2 certification here in the next couple of months. The MaxxForce 15 is EPA-certified. Someone asked me a question

about that today. I assume that was widely known. MaxxForce 15 is fully certified with the EPA.

38.     On March 9, 2011, after releasing its first fiscal quarter 2011 earnings results,

Navistar hosted a conference call for analysts, media representatives and investors during which

defendant Ustian represented the following:

[USTIAN:]    Now let's talk about slide 22, and it's 0.2 emissions for 2010 and beyond, and we have two solutions.

\*      \*      \*

Now let's talk about in-cylinder 0.2. One of our challenges, perhaps as difficult a challenge as the technology itself, was the marketing side of our solution, which is in-cylinder. Since we were the only ones out there, there is a lot coming at us with this can't work and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over.

We want to get in front of the 0.2 now, because we can anticipate there is a next one coming out that 0.2 can't be done. So what we did is we submitted to the EPA a certification of 0.2 to take that argument away. We don't plan on using this for awhile, but we are going to have it out there on the shelf that says it can be done and we can meet the standards and get all of the performance features, as well. So that's what we have done. When you hear about that, it's not that it's coming into production tomorrow. It's just to get it out there and take all that argument away.

\*      \*      \*

[ANALYST:] Couple of things. First, Dan, on the 13-liter Certification of 0.2, can you talk a little bit about what you did to the engine to get it in compliance at that level? Is there is any after-treatment in there or any other tweaks of the engine you can share?

[USTIAN:] Yes, it's the same things. It's in fuel, air, controls, cooling. [ANALYST:] So it's all in cylinders, there's no after-treatment? [USTIAN:] No after-treatment, no.

[ANALYST:] Okay. All right, great. And then one more little one. I think, Dan, at the beginning of call it sounds like you said the MaxxForce 13 was Certified at 0.2, but it looks like you were just saying it was submitted for Certification. Have you actually received Certification?

[USTIAN:] No, we just submitted to the EPA. It takes a period of time, two or three months, before we will hear back from them likely. We aren't in a hurry, we just want to have it out there so we can take the argument away that it can't be done.

39.     On April 5, 2011, Navistar issued a press release entitled "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine At 0.39G NOx - With EPA and CARB Certification of MaxxForce® 15, Submission of MaxxForce® 13 at 0.2g NOx, Company Continues to Make Strides in Its In-Cylinder Emissions Technology Path," which stated in part:

MaxxForce 13 at 0.2g NOx Submitted to EPA

In addition, Navistar also recently submitted its MaxxForce 13 at 0.20g NOx for EPA certification, once again reiterating its prime technology path in meeting the 0.20g NOx standard through in-cylinder technologies. The company intends to phase-in its engines at progressively lower NOx emissions levels (0.4g NOx, 0.35g NOx, 0.3g NOx, 0.25g NOx, etc.) in the years ahead in an effort to make emissions compliance as seamless as possible to its customers.

"During the past several years, while other OEMs were producing engines at or above the required emissions standard, Navistar produced engines much cleaner than the standard, in turn, generating credits that today provide us with the flexibility needed to develop the most customer-focused emissions technologies in the industry," Younessi added. "Our MaxxForce Advanced EGR in-cylinder emissions technology remains the only solution in compliance with EPA standards at the turn of the key, without the need for aftertreatment and without customers having to find and fill liquid urea for their SCR systems."

40.     On June 7, 2011, Navistar issued a press release announcing its second quarter fiscal 2011 results. The Company reported net income of $80 million, or $1.02 diluted EPS. The release stated in part:

"The second quarter results represent good earnings and strong cash flow from operations while building to deliver to our 2011 and beyond objectives," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "We continue to see increasing customer acceptance of all our engine and vehicle families, confirming we have the right strategy in place and that we will deliver full year results toward the higher side of our previous guidance.

*        *        *

"In the second quarter, our growth strategy continued to unfold as we introduced a number of products to the market place," said Ustian. "Our core business has seen an increase in volume and our military and service parts continue to deliver strong results. We also delivered solid results while investing in our future and growing globally."

41. After releasing its second quarter fiscal 2011 results on June 7, 2011, Navistar hosted a conference call for analysts, media representatives and investors during which defendant Ustian represented the following:

[USTIAN:] And of course, emissions and fuel economy is at the forefront of all of that. And in the quarter, you can see we were able to improve fuel economy while lowering our NOX. So it went down - from 0.5, we went to 0.45, and then we went to 0.39. We also launched a 15-liter that we have certification on. That happened in the second quarter.

When we did our analyst presentations in January, we said that engine would have in the first half of the year would be about a breakeven and the second half of the year $100 million profitability. And we're on track to that.

The military revenues, $850 million in the first half and $1 billion in the second half. On track to that. The manufacturing efficiencies, we're on track to all of those.

     *     *     *

[USTIAN:] Henry, I think what we were trying to show from the charts that we talked about today is we'll be impacted by three things in the share in the second half.

First of all, it's the experience that our customers get from, to them, a new engine, the 13-liter, especially in heavy trucks. That is number one. And that's probably the biggest factor is the experience of that 13-liter in our heavy trucks. And that is going along great.

     *     *     *

Henry, one of the things we had in the past , EGR and - this is all gone. We haven't heard any signs of - any even discussion on it, other than the benefits that we get from EGRs, lower weights, and not having to deal with urea. But as far as any discussion on SCR versus EGR, those things were passed a long time ago.

42. The slide presentation prepared for the call included the following slide: -

Q16: What is Navistar doing to meet the 0.20g NOx emissions when its credits are depleted?

A: Navistar remains committed to its strategy of providing solutions that let customers focus on their business, not emissions regulations. Solutions under development are multi-pronged and include our prime path of in-cylinder solutions along with application-specific solutions such as the Amminex metal ammine-based NOx reductant delivery system which Navistar announced in December 2009. We submitted an application for the 0.20g NOx I3L EGR engine to the EPA.

43.      On June 7, 2011, Navistar filed a Form 10-Q with the SEC. The Form 10-Q included Navistar's previously reported results and stated in relevant part:

Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. Advancements in EGR technology have resulted in reductions in emissions of nitrogen oxides ("NOx") from 1.2 or more grams per brake horsepower-hour through 2009 to 0.5 grams in 2010, to as low as 0.39 grams in 2011, with additional reductions in process. Our engines meet current EPA certification requirements because of emissions credits we earned from 2007 through 2009 via the early adoption of technologies that reduced NOx levels beyond what was then mandated. The rate of usage of these emissions credits is dependent upon a variety of factors, including sales, product mix and improvements in technologies. We continue to invest in our EGR technology, combined with other strategies, to meet current EPA emission requirements in North America and Euro IV emissions requirements in South America, as well as evaluate our emissions strategies on a platform-by-platform basis to achieve the best long-term solution for our customers in each of our vehicle applications. As a result of these strategies, we do not expect the rate of usage of emissions credits to have a material adverse effect on our business and believe that coupling EGR with other emission strategies will provide a significant competitive advantage over our competition's products.

44.      The June 7, 2011 Form 10-Q contained certifications signed by defendants Ustian and Cederoth substantially identical to those quoted above.

45.      On August 10, 2011, Navistar hosted a conference call at the Jefferies & Co. Global Industrial and A&D Conference for analysts, media representatives and investors during which defendant Ustian represented the following:

[USTIAN:] So now let's dissect Class 6 and 7. Let's talk about what were the ingredients for us in that strategy. And on the Class 6 and 7 business,

remember, our strategy included taking a technology path that was different than anyone in the world, certainly in North America but basically anyone in the world. And that technology path says that we will answer emissions inside the cylinder without the need for after-treatment. It helps our customer, and obviously our cost structure's a lot better from it, as well.

\*　　\*　　\*

On Class 8s, our strategy was threefold - number one, that same technology path of delivering emissions inside the cylinder.

46.　　On September 7, 2011, Navistar issued a press release announcing its third quarter fiscal 2011 results. The Company reported net income of $1.4 billion, or $18.24 diluted EPS for the period ended July 31, 2011. The release stated in part:

"The industry continued its recovery in the third quarter, and our results reflect this strengthening as well as our continued investments for future growth. We introduced new products for our growing global presence, invested in our engineering integration and heavy engine strategies, and took additional actions to reduce costs and further increase our manufacturing flexibility," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "As a result, we are well positioned to deliver a strong fourth quarter, achieve our adjusted full-year earnings of $5 to $6 per share, and enter 2012 with positive momentum."

\*　　\*　　\*

"Our proven ability to deliver consistent earnings, even in the toughest of times, coupled with our future growth prospects gives us the confidence that we can capture the benefits of these deferred tax assets. As a result, Navistar is now in its best equity position in the last ten years," said Ustian. "Given our strong cash position, we are launching a significant buyback of our stock, which we believe is currently undervalued. We are also evaluating additional return on capital options and look forward to announcing them early in 2012."

47.　　After releasing its third quarter fiscal 2011 results on September 7, 2011, Navistar hosted a conference call for analysts, media representatives and investors during which defendant Cederoth represented the following:

As we move forward, we believe we have adequate cash to support the continued investment in our strategy and expand that strategy to markets such as China and our global truck products. As we move forward and outline our plans for 2012, we will continue to develop our strategy around capital so that we continue to invest in our business, but also incorporate the opportunity to return value to our shareholders.

19

48. The slide presentation prepared for the conference call included the following slide:

Q16: What is Navistar doing to meet the 0.20g NOx emissions when its credits are depleted?

A: Navistar remains committed to its strategy of providing solutions that let customers focus on their business, not emissions regulations. Our primary path continues to be Advanced EGR. This technology is proving extremely viable providing fuel economy and performance on par with the best SCR competitors. Customer acceptance is excellent with over 60,000 vehicles built at 0.5 grams NOx or better. As we develop 0.20g NOx capability our goal of continuing to improve performance and fuel economy at this emissions level is being realized.

49. On September 7, 2011, Navistar filed a Form 10-Q with the SEC. The Form 10-Q included Navistar's previously reported results and stated in relevant part:

Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. Advancements in EGR technology have resulted in reductions in emissions of nitrogen oxides ("NOx") from 1.2 or more grams per brake horsepower-hour through 2009 to 0.5 grams in 2010, to as low as 0.39 grams in 2011, with additional reductions in process. Our engines meet current EPA certification requirements because of emissions credits we earned from 2007 through 2009 via the early adoption of technologies that reduced NOx levels beyond what was then mandated. The rate of usage of these emissions credits is dependent upon a variety of factors, including sales, product mix and improvements in technologies. We continue to invest in our EGR technology, combined with other strategies, to meet current EPA emission requirements in North America and Euro IV emissions requirements in South America, as well as evaluate our emissions strategies on a platform-by-platform basis to achieve the best long-term solution for our customers in each of our vehicle applications. As a result of these strategies, and other legal and regulatory courses of action available to us, we do not expect the rate of usage of emissions credits to have a material adverse effect on our business. We believe that coupling EGR with our other emission strategies will provide a significant competitive advantage over our competition's products.

50. The September 7, 2011 Form 10-Q contained certifications signed by defendants Ustian and Cederoth substantially identical to those quoted above.

51. On October 31, 2011, Navistar hosted a conference call at the Gabelli & Company, Inc. Automotive Aftermarket Symposium, during which defendant Ustian represented the following:

We are the only ones that are able to do - satisfy the emissions regulations inside the cylinder. And we use the same thing - the same tools that are in engine, diesel engine manufacturing. And that is better combustion, better fuel, and air match with an electronic control system that allows those to clean - provide the cleanest burn.

52. On December 20, 2011, Navistar issued a press release announcing its fourth quarter fiscal 2011 and full year 2011 results. The Company reported net income of $255 million, or $3.48 diluted EPS for the fourth quarter ended October 31, 2011. Additionally, the Company reported net income for fiscal year 2011 was $1.7 billion, or $22.64 diluted EPS. The release stated in part:

"We are pleased that we have finished the year strong and delivered solid fourth quarter results across all segments," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "Not only did we deliver on 2011 commitments, we continued to invest in our strategy and set the foundation for a strong 2012."

\*      \*      \*

"We expect the industry to continue its steady recovery," said Ustian. "We will continue to leverage our market leading North American businesses, invest in new products and expand further into global markets, while effectively controlling our costs."

53. After releasing its fourth quarter fiscal 2011 and full-year 2011 results on December 20, 2011, Navistar hosted a conference call for analysts, media representatives and investors during which defendants represented the following:

[CEDEROTH:] We ended the year at just under $1.2 billion of cash, and that's what we expected to be. Cash flow for the quarter was driven by strong EBITDA performance, offset by capital expenditures and share repurchases. As you can see, we completed $125 million of share repurchases within 2011. We expect to complete the remainder of our $175 million program in 2012. Both the parent company and NFC completed significant refinancings within the fourth quarter. I think it is important to note that these deals have allowed us to expand our liquidity, lower our borrowing costs, and extend our maturities.

\*      \*      \*

Our next growth opportunity is our global business. In 2011, our global revenue exceeded $3 billion. When you step back and you look at the products that we have, the products we can develop, and then couple these products with

21

the distribution points that we've added, you can see we're laying the ground work for a great business in the future.

*       *       *

[ANALYST:] Are you able to keep the savings that you have from the S[C]R approach or do you have to compete on a little bit of discounting? Or are you even getting a premium in some cases because people want to go S[C]R rather than - or want to go rather EGR rather than S[C]R?

[USTIAN:] Well, here is our strategy on it. The price is the same. We compete against everyone that is out there on a product, not on a technology. So as long as our product performs as well or better, we can price it not based on cost, but based on vehicle and that is exactly what we have been able to do.

*       *       *

[ANALYST:] So just a question on the 13-liter and certification, just progress within that process, and any communication between you and the EPA and when we could potentially see any news on certification at point two?

[USTIAN:] Here is where we're at. We are going to submit four certifications to the EPA on the big bore engine family, mostly the 13-liter first. This is how it works. If you go back into time, remember, for those of you that are not familiar with this, what we did is kind of a building block strategy on emissions and our emissions strategy is inside the cylinder. So what we did is keep the standards that earned credits. Use the credits while we get the technologies maturing. We've also said that the first product that would utilize all of those credits up would be on big bore engines and that is kind of where we're at. So we are prepared now with the advancements in our technology and the strides we've made to mature that point to a solution to be able to submit is to the EPA in the very short term. What we're going to do is on - we will be able to show you all of that how on analyst day on February 1 and I think it will become clear to you how we're able to do that, but integration is a big part of it. Obviously technology advancements in fuel, air, and controls is what makes that work for us.

54.     On December 20, 2011, Navistar filed a Form 10-K with the SEC signed by defendants Ustian and Cederoth. The Form 10-K included Navistar's previously reported results and concealed recalls affecting tens of thousands of vehicles Navistar had sold.

55.     The Form 10-K also noted:

We plan to submit certification applications to both EPA and CARB in the near future. We believe that our engines meet both agencies' certification requirements.

22

56.     The December 20, 2011 Form 10-K contained certifications signed by defendants Ustian and Cederoth substantially identical to those quoted above.

57.     On January 23, 2012, Land Line Magazine issued an article entitled: "Navistar running low on emissions credits but has a plan," which stated in part:

> Navistar engines produced for several models of heavy-duty trucks are only certified to meet federal emissions standards until late February. After that point, the truck builder will have run out of emissions credits unless it unveils a new engine that meets federal NOx standards.
>
> Navistar says it has a plan and will be unveiling a new engine "very soon."
>
> *     *     *
>
> The emissions credits issue affects Navistar big bore engines of 11, 13 and 15-liters, said Navistar Spokeswoman Karen Denning.
>
> "Navistar remains confident in our EGR strategy and will be submitting a .2 engine for certification very soon," Denning told Land Line Magazine Monday.

58.     On February 1, 2012, Navistar hosted an analyst and investor day conference call for analysts, media representatives and investors during which the following was represented:

> [JACK ALLEN:] Well, let's talk about another one, because it's been my experience over the last few years that you really can't have much of a meeting at Navistar without it gravitating into a discussion about engine emissions and where we're going.
>
> So as you've all read, over the last couple of weeks here, once again our competitors - they're taking their best shot at us over this. And that's okay. If we didn't have them worried, they wouldn't be so vocal.
>
> *     *     *
>
> And then the third one, achieve 0.2 emissions and achieve it without external after treatment.
>
> Without a doubt in our minds, and I think that of the industry, our solution is the simplest. It is the most customer-friendly. And we are providing a school or better performance than the SCR systems without any of the cost, without the maintenance or without the hassle of SCR.
>
> On our 0.2 as Dan said, we submitted that earlier this week. This is a production engine. This will have no degradation in performance.

23

We've been working back and forth with the EPA now for a number of months on this submission. And as you know, it is a complicated process and it takes time. The EPA will evaluate our submission and we will work back and forth with them. At the same time, we'll take the time to make sure that this engine and this calibration is ready for production.

So what do we do in the meantime? Well, we have a clear path that we are going to be able to build this year and certify our engines in all 50 states. That's not under debate, from our standpoint.

\*       \*       \*

Our goal is to continue to demonstrate that we are a leader in this area. We are the only manufacturer in the world was going to have a 0.2 gram NOX engine - out of the engine - engine out alone. We will have lower N2O levels than any SCR engine.

\*       \*       \*

[ANALYST:] I wanted to ask A.J. about the guidance, the $5 to $5.75. You mentioned that there were a couple of issues that just came up, the brake problem and the EPA certification. Are any costs related to those two issues in your guidance?

[CEDEROTH:] Let me take them one at a time. I don't expect any issues with the EPA certification, so, yes, that is built into what we have forecasted.

\*       \*       \*

[ANALYST:] A couple of other questions on the engines. Can you give us a sense what the differences are between the current engine that is with the EPA, a 0.2 versus the one at 0.43? And can you just give us a sense of looking from the outside, why you let it get down to this level where you may be close to running out of credits? And we will start with that.

[ERIC TECH:] What is interesting about that, and I hope those of you that had a chance to take a tour get a better appreciation for what controls due to products these days, and the tighter we can make these controls and the faster we can make these controls and the integration of these controls gives us dials that enable us to finetune the engine so that the matchup during transitions of burned fuel gives us a better burn.

When we go out on the floor over there, our guys are going to show you how that happens. But essentially there is no change to that engine. It is all in the responsiveness of the control unit that is before that.

And as far as waiting so long, I mean we have to develop those controls, and that is just what it took to get us to that.

24

*    *    *

[ANALYST:] Capital. Dan, last year you set a market share goal, and your market share stayed pretty low, and now you are certifying the new 0.2 engine. How is that going to affect your market share as you go forward? What are your customers saying? Are they - do they need to try out the new vehicle longer? And so what is the long-term prognosis for your market share?

[USTIAN:] Well, interesting, the simple answer to that is it is going to be invisible to the customer. Obviously that is the best thing for us.

We have launched some new products over the past several months in the 15 liter area and now in the 13 liter area with the LoneStar that will help us gain that market share back. But, as far as the customer sees on 0.2, he will not know the difference. That has always been the plan, and we are able to produce that now. Invisible. No impact on fuel economy, no impact on performance.

59.    On February 14, 2012, Navistar stock dropped after a blog stated that the EPA had advised Navistar it would be fined for shipping thousands of back-dated engines during its 2010 engine transition. The fines were expected to be as much as $37,500 per violation, or up to $285 million.

60.    On March 8, 2012, Navistar issued a press release announcing its first quarter fiscal 2012 results. The Company reported a loss of $153 million, or ($2.19) diluted EPS for the first quarter ended January 31, 2012. The release stated in part:

"We proactively addressed these product issues in a low usage period during the first quarter, which we believe will improve long-term customer satisfaction and reduce warranty costs," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "Strategically, we achieved a number of key milestones in the first quarter, including our submission of a 0.2 NOx engine for EPA certification and the announcement of our development of a full range of natural gas truck offerings."

*    *    *

"We remain confident in our ability to deliver strong 2012 profit performance and make continued progress toward our long-term growth goals," Ustian said. "We are already seeing accelerated synergies from our recent move into our new integrated product development center beyond the $60 million we originally estimated. We now believe this integration of our people will unlock up to $100 million in savings toward our bottom line in 2012."

61. After releasing its first quarter fiscal 2012 results on March 8, 2012, Navistar hosted a conference call for analysts, media representatives and investors during which defendant Ustian represented the following:

[ANALYST:] First, thanks for the clarification on the $25 million NCP hit. Dan, could you or AJ let us know how many months you are assuming the NCP payments continue for that $25 million hit?

[USTIAN:] Andy, here's maybe a way to look at it. We have submitted for the .2 and that goes through a process of - typically, that's about three months, I think, is about the average of that. When we get the certification, it still takes some time for us to get to production on this. So what we are doing right now is getting ready to go to production, and it will be about June before we can get into production with that particular engine. So that kind of gives you a framework of where it would be. As for the preciseness of it, we can't tell you, but our objective is to be in production on that in June.

\* \* \*

[ANALYST:] Can you talk a little about the impact of these higher warranties on residual values for your used trucks? And then secondly, could you talk a little bit about 15 liters 13 liter. You've only submitted a 13 liter for approval to the EPA. Does that mean you are giving up on the 15 liter? And, you know, we look at Cummins the last couple months and it is gaining engine share suggesting that (inaudible) are still specifying 15 liter engines out there. Sorry for the lengthy questions, but if you could just kind of hook the two of those together, I would appreciate it.

[USTIAN:] Sure. Ann, I'll ask Jack to answer those. Go ahead, Jack.

\* \* \*

[JACK ALLEN:] Regarding the submission, I guess was your second question, we submitted the 13 liter, we're prepared to submit the 11 and 15, and I am not quite sure why you would jump to the conclusion we are abandoning it, but we are prepared to submit the 11 and 15, but it really doesn't make a lot of sense to do that till the EPA addresses that 13 liter. And we can work back and forth with them and then we'll follow on with the 11 and 15 liter.

62. On March 8, 2012, Navistar filed a Form 10-Q with the SEC. The Form 10-Q included Navistar's previously reported results and contained certifications signed by defendants Ustian and Cederoth substantially identical to those quoted above.

26

63.     On April 19, 2012, Wells Fargo downgraded Navistar to Market Perform, citing

challenges for the Company, including soft truck demand and EPA emissions certification.

64.     Within a week, the Company's stock dropped from $35.86 per share to $33.61 per

65.     On June 7, 2012, Navistar issued a press release announcing its second quarter

fiscal 2012 results. The Company reported a loss of $172 million, or ($2.50) diluted EPS for the

second quarter ended April 30, 2012. The release stated in part:

> "Certainly, our first half performance was unacceptable. It included a
> warranty reserve to repair early 2010 and 2011 vehicles," said Daniel C. Ustian,
> Navistar chairman, president and chief executive officer. "We were also affected
> by speculation surrounding our engine certification for our Class 8 engine, which
> is why we are working tirelessly with the U.S. EPA to get resolution."
>
> *        *        *
>
> "Going forward, we've identified a path for delivering strong profits in the
> second half of 2012," Ustian said. "Historically, the second half is stronger across
> our businesses, and we expect to build on this with improved market share in
> North America, stronger global performance and further cost reductions across all
> operations. Additionally, we're making management and operational structure
> changes to align our organization in a more effective manner to drive these
> results."
>
> *        *        *
>
> "I am confident that our new management structure will lead to greater
> planning and execution around our integration strategy, further enabling us to
> deliver enterprise-wide profitability, leverage assets more effectively, streamline
> decision making and bring renewed energy to our team," Ustian said.

66.     After releasing its second quarter fiscal 2012 results on June 7, 2012, Navistar

hosted a conference call for analysts, media representatives and investors during which

defendant Ustian represented the following:

> [ANALYST:] The question is - we will start with EPA engine certification. You
> said in your Q that you resubmitted that, I think, in May. Do we have any idea
> what the difference between what you submitted in February and what you
> submitted in May? And what are your views on when and if this thing gets
> approved? And how much of that is built into your second-half forecast, which is
> just a massive sequential improvement?

[USTIAN:] For sure, Steve. Let's define what we did there. In working with the EPA, they asked us if there was some spots that they wanted us to modify, and so we did that. And we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera. And so we resubmitted that back to them and we're in the process now of working with them on getting that certified. So there's where that stands. Of course, it's hard for us since it is somewhat out of our control to tell you exactly the timing of any of that so I hope you can appreciate that. But that's the process we're in right now.

67.     On June 7, 2012, Navistar filed a Form 10-Q with the SEC. The Form 10-Q included Navistar's previously reported results and stated in relevant part:

In order to meet the current on-highway heavy-duty diesel ("HDD") emission standards, HDD engines must be certified by the EPA for compliance with the 0.20g oxides of nitrogen ("NOx") standard, which also includes standards for on-board diagnostics. Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet the 0.20g NOx standard. Our approach with EGR has dramatically reduced our NOx emissions compared to the previous NOx standard and we believe it is an environmentally friendly approach compared to the liquid-based urea Selective Catalytic Reduction ("SCR") systems used by our competitors. However, we have not yet been able to obtain 0.20g certification for any of our HDD engines. Currently, we are able to sell our trucks which incorporate HDD engines and sell our engines by using emission credits or paying non-conformance penalties ("NCPs").

68.     The June 7, 2012 Form 10-Q contained certifications signed by defendants Ustian and Cederoth substantially identical to those quoted above.

69.     On July 6, 2012, Navistar disclosed that it was abandoning its Advanced EGR engine technology in favor of SCR (the technology used by its rivals) in order to meet 2010 EPA emissions standards. The release stated in part:

Navistar International Corporation today announced that it will introduce its next generation clean engine solution - In-Cylinder Technology Plus (ICT+) - to meet 2010 U.S. Environmental Protection Agency (EPA) emissions regulations and position the company to meet greenhouse gas (GHG) rules in advance of 2014 and 2017 requirements. The ICT+ technology combines Navistar's advanced in-cylinder engine expertise with urea-based aftertreatment and is expected to be available beginning early 2013.

*       *       *

28

By incorporating an already proven and certified aftertreatment system, the company looks forward to seamlessly offering production-ready vehicles early next year. Furthermore, this approach is expected to provide a clear path to quickly achieving 2017 GHG standards.

70.     On this news, Navistar stock declined $4.37 per share, or 15% (from $28.79 to $24.42) on volume of 7.3 million shares. Over the following two days, the stock declined another $2.47 per share, or 10%, on volume of 10.6 million shares.

71.     Then, on August 2, 2012, Navistar issued a press release entitled "Navistar Announces Actions Designed to Enhance Competitive Position, Drive Profitable Growth and Increase Shareholder Value," announcing that is was withdrawing its full-year fiscal 2012 guidance until the release of its third fiscal quarter 2012 results in September. Further, the Company disclosed receiving a formal letter of inquiry from the SEC involving an investigation of various accounting and disclosure matters dating back to November 2010 by the SEC.

72.     As a result of this news, the price of Navistar's common stock dropped from a closing price of $24.77 per share on August 1, 2012 to $21.44 per share on August 2, 2012, a decline of approximately 13% in one trading day on volume of nearly 7.6 million shares. This decrease was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

73.     On August 27, 2012, Navistar replaced Ustian as CEO.

74.     Documentation from the EPA and a related D.C. Court of Appeals case that was made available in 2012 demonstrate that, in reality, Navistar had never achieved an EPA-compliant 0.20g NOx EGR engine and had not even applied for EPA certification prior to January 31, 2012. Even then, Navistar's application covered just 1 of its 6 engine families and was riddled with critical problems that resulted in the EPA sending it back and, eventually, the Company withdrawing it altogether.

75.     At a September 28, 2012 Company event, Jim Hebe, Navistar Senior Vice President, acknowledged: "We have got the right emissions strategy, finally. . . . The public will see a more upfront approach from Navistar .... We're through with the B.S.," he said. "We've had enough of it the past three years."

76.     In October 2012, the Company finalized an agreement with Cummins Inc. for SCR engines and emissions technology.  Specifically, the agreement with Cummins Emission Solutions included Cummins providing an SCR after treatment system for Navistar's Max Force 13 liter engines as Navistar's clean engine solution production of its 13-liter models with the SCR system was planned to begin production in April 2013.

77.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Navistar's attempted methods to achieve compliance with EPA guidelines in truck manufacturing had failed and were not working, and Navistar would be forced to revise its plan to meet guidelines, incurring enormous costs to the Company.

(b)     Navistar did not have engines ready to meet the 2010 EPA standards.

(c)     Navistar's filings with the SEC contained incomplete and misleading disclosures, including statements about the costs of recalls and details of various debts.

(d)     Based on the above, defendants lacked a reasonable basis for their positive statements about the Company and its revenue outlook.

78.     As a result of defendants' false statements, Navistar common stock traded at artificially inflated levels during the Class Period. When defendants revealed Navistar's true financial condition and future business prospects, the price of Navistar common stock fell over 69% from its Class Period high.

## LOSS CAUSATION/ECONOMIC LOSS

79.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market. This artificially inflated the price of Navistar common stock and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Navistar common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Navistar common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

80.     Navistar's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

81.     The defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer of Navistar who knew that the forward-looking statements was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION
## OF RELIANCE: FRAUD ON THE MARKET

82.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Navistar common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

83.     At all relevant times, the market for Navistar common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Navistar filed periodic public reports with the SEC; and

(b)     Navistar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Navistar

during the Class Period (the "Class"). Excluded from the Class are defendants and their families, directors and officers of Navistar and their families and affiliates.

85.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Navistar has more than 80 million shares of common stock outstanding, owned by hundreds or thousands of persons.

86.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Navistar common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

87.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

88.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

90.     Plaintiff repeats and re-alleges each and every paragraph contained above as if fully re-written and re-alleged herein.

91.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Navistar common stock during the Class Period.

93.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Navistar common stock. Plaintiff and the Class would not have purchased Navistar common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

94.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Navistar common stock during the Class Period.

**COUNT II**
**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

95.     Plaintiff repeats and re-alleges each and every paragraph contained above as if fully re-written and re-alleged herein.

96.     The Individual Defendants acted as controlling persons of Navistar within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Navistar, the Individual Defendants had the power and ability to control the actions of Navistar and its employees. Navistar controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  April 10, 2013                              MILLER LAW LLC

By  *s/ Lori A. Fanning*_____
            Lori A. Fanning

Lori A. Fanning, Esq.
Miller Law LLC
115 S. LaSalle St.
Suite 2910
Chicago, IL 60603
Telephone: (312) 676-2667
LFanning@MillerLawLLC.com

*Liaison Counsel for Plaintiff*

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk
Mark L. Knutson
501 West Broadway, Suite 1250
San Diego, CA 92101-3593
Telephone:  (619) 238-1333
Facsimile:   (619) 238-5425

*Counsel for Plaintiff*

GLANCY BINKOW & GOLDBERG LLP
Michael Goldberg
Rob Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160